In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-20-00223-CV
_____

CLAY ELWOOD AUTERY III, Appellant

V.

TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellee

On Appeal from the County Court at Law No. 1
Jefferson County, Texas
Trial Cause No. 135423

## MEMORANDUM OPINION

In two issues, Clay Elwood Autery III challenges an administrative order authorizing the suspension of his driver's license under Chapter 524 of the Texas Transportation Code. That chapter requires the Department of Public Safety to suspend a person's driving privileges if

the person operates a motor vehicle in a public place with an alcohol concentration of 0.08 or higher.[1]

Autery contends the administrative order revoking his license should be reversed because the evidence the administrative law judge (ALJ) considered doesn't support a finding that the State trooper had reasonable suspicion to investigate why Autery stopped his vehicle on the shoulder of the road and doesn't support a finding that the trooper was exercising a community-caretaking exception when he initiated the investigation that led to Autery's arrest. Because the record supports the Department' ruling revoking Autery's license, we will affirm.

Background

In 2019, Trooper Oscar Camarillo saw a vehicle stopped on the shoulder of Interstate 10. The trooper activated his emergency lights and stopped behind Autery's vehicle. When he approached Autery's vehicle, he found Autery in the driver's seat but unresponsive, which left the trooper with the impression that Autrey was either asleep or

---

[1]Tex. Transp. Code Ann. §§ 524.011, 524.012; *see* Tex. Penal Code Ann. §§ 49.01(1)(A), 49.01(2)(B).

unresponsive. When Autery woke up, he agreed to the trooper's request to submit to an intoxilyzer breath test.

Autery provided two samples of his breath. Both revealed an alcohol concentration above 0.08 grams per 210 liters of breath.[2] Based on these results, Trooper Camarillo arrested Autery for DWI, gave Autery a written notice that his driver's license was temporarily suspended, and confiscated Autery' license.[3] The written form Trooper Camarillo gave Autery served as Autery's temporary driver's license for 40 days. The form also notified Autery how to obtain a hearing to contest the suspension of his license.

Autery requested an administrative hearing and contested the suspension of his license. During the hearing, Autery argued the Department's decision to suspend his license should be reversed because Trooper Camarillo didn't have reasonable suspicion to believe that Autery was engaged in criminal activity when the trooper initiated his investigation to determine why Autery had stopped. And he also argued

---

[2]*See* Tex. Transp. Code Ann. §§ 524.011, 524.012, 524.022.

[3]Officer Camarillo used a form titled "NOTICE OF SUSPENSION" and labeled as the DIC-25 (Rev. 10/09) when he confiscated Autery's license.

that Trooper Camarillo wasn't engaged in a community-caretaking function when he decided to investigate why Autery had stopped in the emergency lane on I-10.

Trooper Camarillo was the only witness who testified in the administrative hearing. In addition to the trooper's testimony, the ALJ considered several exhibits admitted into evidence during the hearing: (1) the trooper's sworn report of Autery's stop; (2) the probable cause affidavit tied to Autery's arrest, (3) the statutory notices and warning the trooper gave Autery following the stop; and (3) the results of the intoxilyzer tests on the Autrey's breath.

During the hearing, Trooper Camarillo testified he conducted "a welfare check" on Autery's vehicle after observing it on the shoulder of I-10 with the engine and "hazard lights on." According to the trooper, after he approached the vehicle, he noticed that Autery was either "asleep or unconscious." Then, the trooper knocked on the window of the vehicle "a couple of times and [Autery] finally woke up." Trooper Camarillo explained Autery rolled down the window and he noticed that Autery smelled of alcohol, seemed disoriented, and had glassy eyes.

The trooper asked Autery to perform the standard field sobriety tests. On the horizontal-gaze nystagmus, the walk-and-turn, and the one-leg-stand, Trooper Camarillo testified that Autery revealed numerous clues of intoxication, which the trooper described as a sign that officers look for as a clue when evaluating whether person is intoxicated. Based on the investigation and the results of the field sobriety tests, Trooper Camarillo arrested Autery and charged him with DWI.

Following the hearing, the ALJ signed an order authorizing the Department to suspend Autery's driver's license for 90 days.[4] In the order, the ALJ found "reasonable suspicion to stop [Autery] existed, in that Trooper O. Camarillo, after completing a traffic stop on the side of I-10 in Jefferson County, Texas, observed Defendant asleep and slumped over the wheel of a vehicle with hazard lights activated stopped on the side of the road."[5] Relying on the evidence that the trooper gathered after approaching Autery's vehicle and the results of Autery's field sobriety

---

[4]*See id.* § 524.022.

[5]The traffic stop the ALJ referenced in her findings appears to reference a stop Trooper Camarillo testified he made of another vehicle that morning before he saw Autery's vehicle, which was already at a stop when the trooper saw it in the emergency lane of I-10.

tests, the ALJ found the trooper had "probable cause" to support Autrey's arrest.

Autery filed a notice that he wanted to appeal the ALJ's ruling to the County Court at Law Number One in Jefferson County, Texas.[6]. Although subject to an exception that does not apply here, the review of an administrative decision in a driver's license revocation case is conducted "on the record certified by the State Office of Administrative Hearings with no additional testimony."[7] In reviewing the ALJ's decision, the County Court at Law Number One conducted its review on a certified copy of the administrative record; stated another way, the parties presented no additional testimony to the County Court at Law in the appeal.

After reviewing the record, the presiding judge of the County Court at Law Number One denied Autery's appeal. Autery then filed an appeal of the County Court at Law's ruling with this Court. We note we have jurisdiction over Autery's appeal because the value of a person's driving

---

[6]*See id*. § 524.041.
[7]*Id*. § 524.043.

6

privileges exceeds the amount in controversy ($100) required to establish appellate jurisdiction.[8]

## Standard of Review

Since the statute giving Autery the right to appeal—section 524.043 of the Texas Transportation Code—doesn't define the scope of judicial review, we review Autery's appeal under the substantial evidence rule.[9] Here, the trial court affirmed the ALJ's decision. Consequently, we may reverse the trial court's ruling or remand the case for further proceedings only if two conditions are met: (1) the appellant's substantial rights were prejudiced, and (2) we conclude the trial court abused its discretion in failing to find the ALJ's decision was:

(A) in violation of a constitutional or statutory provision;
(B) in excess of the agency's statutory authority;
(C) made through unlawful procedure;
(D) affected by other error of law;
(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

---

[8]*Tex. Dep't of Pub. Safety v. Barlow*, 48 S.W.3d 174, 175-76 (Tex. 2001) (holding "the courts of appeals do have jurisdiction over [the appeal from the county court at law's ruling]" from a ruling denying an ALJ's decision suspending a person's driver's license).

[9]Tex. Gov't Code Ann. § 2001.174; Tex. Transp. Code Ann. § 524.043; *see also Tex. Dep't of Pub. Safety v. Alford,* 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[10]

Under a substantial evidence review, we "may not substitute our judgment for the judgment of the state agency on the weight of the evidence."[11] "We must uphold the agency's ultimate decision if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."[12] The burden to prove the agency's decision is unsupported is on the party contesting the agency's ruling, as courts must presume substantial evidence supports the decision the agency made.[13]

## Analysis

In two issues, Autery challenges the trial court's ruling affirming the ALJ's decision. In Autery's first issue, he argues Trooper Camarillo didn't articulate a reasonable suspicion justifying the stop. In issue two, he argues that because the stop was not justified, the exclusionary rule and fruit of the poisonous tree doctrine bars the State from relying on the

---

[10]*Id.*
[11]*Dyer v. Tex. Comm'n on Envtl. Quality*, 646 S.W.3d 498, 514 (Tex. 2022) (cleaned up).
[12]*Id.*
[13]*Id.*

8

evidence it developed in Trooper Camarillo's investigation, which is the evidence that resulted in Autery's arrest.

In the administrative proceeding, the ALJ found "reasonable suspicion" justified Trooper Camarillo's decision to stop Autery.[14] In response to Autery's argument, the Department says Trooper Camarillo's "initial contact with Autery is legally justified as a community caretaking stop[.] It then notes: "A community caretaking stop does not require reasonable suspicion." The Department characterizes the ALJ's use of the term "reasonable suspicion" as "mistaken." And the Department acknowledges that while the record supports the ALJ's finding the trooper found Autery unresponsive, the record does not support the ALJ's finding that the trooper found him "slumped over the wheel of the vehicle[.]"

Even though the Department makes these concessions, the Department argues substantial evidence in the record still supports the ALJ's ultimate ruling because the record shows Trooper Camarillo checked on Autery's vehicle as a welfare check and motorist assist under

[14]Tex. Transp. Code Ann. § 524.035(a).

9

circumstances showing the trooper was carrying out his community-caretaking function rather than his duties investigating crimes. For that reason, the Department concludes Autery cannot meet his burden of proof to show his substantial rights were prejudiced by the ALJ's extraneous findings even though it agrees the findings Autery challenges on probable cause to arrest and whether the trooper found Autery slumped over the wheel of the vehicle are findings that aren't supported by the evidence admitted by the ALJ in the administrative hearing.

We agree the evidence in the administrative hearing doesn't show that Trooper Camarillo testified he was suspicious that Autery had committed a traffic violation or a crime when he saw Autery's vehicle stopped in the emergency lane on I-10. Instead, Trooper Camarillo testified that when he saw the vehicle, he "checked on [the vehicle he saw stopped in the emergency lane on I-10] as a welfare check and motorist assist."[15]

Thus, we agree the ALJ's "reasonable suspicion" finding is erroneous. Even so, we must "uphold the agency's ultimate decision if the

---

[15]The trooper's sworn report listed the reason for the contact as, "Motorist Assist, disabled on outside shoulder."

evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."[16] So the question is whether the ALJ rejected Trooper Camarillo's testimony that he was conducting a welfare check and motorist assist, which is what he said he was doing, when he stopped behind Autery vehicle. First, we note that during closing argument, the Department's attorney asked the ALJ to make an affirmative finding that the trooper was conducting a welfare check when he checked on Autery's vehicle. The ALJ, however, did not make that specific finding in response to the Department's request. Yet the ALJ also didn't find that Trooper Camarillo was not conducting a welfare check when he stopped behind Autery and approached his vehicle, which was stopped when the trooper first saw in in the emergency lane on I-10. Second, we note that Trooper Camarillo's testimony about checking on Autery's vehicle as a motorist assist and welfare check was undisputed. The trooper never testified he stopped Autery's vehicle or decided to approach the vehicle because he thought Autery had violated a traffic law or was suspicious that Autery had

---

[16]*Dyer*, 646 S.W.3d at 514.

committed a crime. Third, under Texas law, not only must Autery show the findings he challenges are faulty as a matter of law, but he must also show the ALJ's faulty findings—here, the reasonable suspicion to stop and probable cause findings—prejudiced Autrey's substantial rights.[17]

Police officers have community-caretaking functions because we expect them "to aid individuals who are in danger of physical harm, protect the rights to speak and assemble, facilitate the movement of people and vehicles, assist people who cannot care for themselves, resolve conflict, and deter crime through their conspicuousness."[18] When police officers are acting in their "community-caretaking functions," they are generally not considered to be engaged in the investigation of a crime.[19]

To determine whether an officer is exercising a community-caretaking function, we ask: "(1) whether the officer was primarily motivated by a community-caretaking purpose; and (2) whether the officer's belief that the individual needed help was reasonable."[20] Generally, a police officer's subjective belief about whether a person

---

[17]*Id.*
[18]*Byram v. State*, 510 S.W.3d 918, 920 (Tex. Crim. App. 2017).
[19]*Id.*
[20]*Gonzales v. State*, 369 S.W.3d 851, 854-55 (Tex. Crim. App. 2012).

needed help turns on these four, non-exclusive factors: "(1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others."[21]

On appeal, Autery argues the community-caretaking exception doesn't apply. According to Autery, the evidence doesn't support an implied community-caretaking finding because Trooper Camarillo testified that he would have stopped and detained Autery even had Autery "turned his hazards off and turned his blinker on and got back on Interstate 10." Autery concludes that just because he was stopped in the emergency lane of a major interstate highway at six o'clock in the morning with his hazard lights on, without more, doesn't justify the inference that Trooper Camarillo made that Autery was a danger to himself or to others.

We disagree with Autery that the record doesn't support a ruling the ALJ must have made to support a decision to suspend Autery's

_____

[21]*Byram*, 510 S.W.3d at 923.

13

license, which is that the investigation that led to Trooper Camarillo's discovery of Autery's intoxication was based on the trooper's community-caretaking role rathe rather his role investigating crime. For instance, there's substantial evidence in the record that Trooper Camarillo saw Autery's vehicle in the emergency lane of a major interstate highway with its hazard lights flashing. The trooper testified the reason he decided to check on Autery's vehicle is that "the vehicle was on. I checked on him as a welfare check and motorist assist." Thus, substantial evidence in the record shows that Trooper Camarillo subjectively believed he was exercising his role as a community caretaker rather than his role in investigating crime. Trooper Camarillo explained that, as he approached Autery's vehicle, he saw Autery and thought he was either asleep or unconscious. The trooper went to the passenger side of Autery's vehicle and knocked on the window. But Autery didn't respond. Then Trooper Camarillo went to the driver's side of the vehicle, he knocked on the window a few times when, "[Autery] finally woke up." According to Trooper Camarillo, Autery rolled down the window, appeared "very disoriented, and then that's when I could smell the alcohol and he had glassy eyes." The trooper also explained that based on the direction

14

Autery had parked his car, he was headed in a direction inconsistent with the one he should have been in had he been driving to the city where he said he was headed.

In his brief, Autery relies heavily on Trooper Camarillo's testimony that he would have stopped Autery even if Autery had turned off his hazard lights and left the scene. But in our review, we consider the entire record rather than a subset of the evidence that looks only to what Trooper Camarillo said in response to a hypothetical question, which omitted many relevant facts. For example, Autery's attorney left out the fact that Trooper Camarillo found Autery unresponsive in his car, and omitted facts showing that when the trooper woke Autery up, the trooper noticed Autrey smelled of alcohol, appeared disoriented, and had glassy eyes.

We conclude substantial evidence in the administrative record allowed the trial court to find the agency's decision to revoke Autery's license was justified because Trooper Camarillo was exercising a

community-caretaking function when he stopped and checked on Autery.[22] Because Autery's first issue lacks merit, it is overruled.

In issue two, Autery contends the trial court erred by admitting evidence the Department obtained after Trooper Camarillo detained Autery and arresting him for DWI. According to Autery, the exclusionary rule and fruit of the poisonous tree doctrine barred the Department from relying on this evidence. Generally, the State is not allowed to use evidence it obtains directly or indirectly from an illegal seizure.[23] We note that Autery's attorney stated he had no objections when the Department's attorney offered the Department's exhibits into evidence during the administrative hearing. During the administrative hearing,

---

[22]*See Dyer*, 646 S.W.3d at 514 (noting that under the substantial evidence standard, an "improper, but superfluous, finding does not prejudice the substantial rights of the appellant"); *see also Solano v. State*, 371 S.W.3d 593, 595 (Tex. App.—Amarillo 2012, no pet.) (holding a police officer was engaged in community-caretaking function when he stopped to check on a vehicle on the side of the road with its hood raised and its hazard lights flashing); *Wiseman v. State*, No. 02-06-021-CR, 2006 Tex. App. LEXIS 10030, at *15-16 (Tex. App.—Fort Worth 2006, pet. ref'd) (not designated for publication) (holding a police officer was engaged in community-caretaking function when he stopped to check on a vehicle parked against a curb in an apartment complex with its hazard lights on and a passenger half in and half out of the vehicle).

[23]*See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Smith v. State*, 542 S.W.2d 420, 422 (Tex. Crim. App. 1976).

Autery's attorney also didn't make any objections to Trooper Camarillo's testimony. Thus, the arguments Autery raises in his second issue were not properly preserved for our review.[24] But even had Autery preserved them, we have explained that Trooper Camarillo obtained the evidence legally because the record contains substantial evidence showing the community-caretaking exception applies to Autery's encounter with the trooper, which led to the evidence that resulted in Autery's arrest.[25]

## Conclusion

We conclude the trial court did not abuse its discretion in denying Autery's appeal from the Department's ruling suspending Autery's driver's license. We overrule Autery's issues and affirm the order denying Autery's appeal.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on January 24, 2022
Opinion Delivered December 22, 2022
Before Kreger, Horton and Johnson, JJ.

_____

[24]Tex. R. App. P. 33.1(a).

[25]*State v. Brabson*, 976 S.W.2d 182, 185 (Tex. Crim. App. 1998) (noting the issue of "probable cause" is not properly before the ALJ in a driver's license revocation hearing—i.e., the finding of probable cause is superfluous).